UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAT, INC., et al,

        Plaintiffs,

v.

NATIONAL CITY BANK OF THE MIDWEST
and NATIONAL CITY CORP.,

        Defendants.

_____/

Case No. 06-11937

Honorable Nancy G. Edmunds


**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [131]**


Plaintiffs JAT, Inc. ("JAT"); Body of Christ Christian Center ("Body of Christ"); Good

Fight of Faith Ministry ("Good Fight"); Pleasant Hill Baptist Church ("Pleasant Hill");

Samaritan Baptist Church ("Samaritan"); 3M Contracting, Inc. ("3M"); and Phillip Peake filed

this action against Defendants National City Bank of the Midwest ("the Bank") and National

City Corporation.  Plaintiffs allege that Defendants violated the Fair Housing Act ("FHA"),

42 U.S.C. §§ 3601-19; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-

1691f; and the Civil Rights Act of 1866 and 1870 ("CRA"), 42 U.S.C. §§ 1981 and 1982.

Plaintiffs' claims are premised upon Defendants' alleged policy of "redlining"[1] against

African-American-owned businesses in the City of Detroit with respect to commercial loans.

In a previous opinion and order, the Court dismissed the FHA claims of all Plaintiffs except

[1]Redlining is "[c]redit discrimination (usu[ally] unlawful discrimination) by a financial
institution that refuses to make loans on properties in allegedly bad neighborhoods." *Black's
Law Dictionary* 1283 (7th ed. 1999).

3M; the ECOA claims of JAT, Pleasant Hill, Samaritan, and Peake; and the CRA claim of Peake.  (Docket Text # 20).

This matter comes before the Court on Defendants' motion for summary judgment. For the reasons set forth below, Defendants' motion is GRANTED.

## I.    Facts

The bulk of the relevant facts in this case have been set forth in the Court's prior opinions and orders.  Nonetheless, because this is a factually intensive case, and because additional facts are necessary to resolve Defendants' motion, the Court will restate the facts here.

The Bank is a wholly-owned subsidiary of Defendant National City Corporation, and it provides a variety of financial services throughout Michigan and the surrounding states. (Compl. ¶¶ 10-11.)

Plaintiff JAT is an African-American owned travel business that specializes in charter motor coach service throughout the U.S. and Canada.  (Compl. ¶ 3; Pls.' Resp. at 10.)  JAT is owned and operated by John and Yvonne Turner.  (*Id.*)  JAT used a broker named EVO Accounting & Financial Services, Inc. ("EVO") to apply for a commercial loan from the Bank in 2004.[2]  (Defs.' Mot. at 6; Pls.' Resp. at 10.)  The Bank denied the application on March 10, 2004, for the following reasons: insufficient cash flow, excessive obligations related to income, insufficient net worth, and insufficient financial statements.  (Defs.' Mot., Ex. F at Ex. 8.)  JAT claims that it subsequently obtained a loan from Bank One at a higher rate of interest.  (Compl. ¶ 3.)  In contrast to this assertion, however, JAT's owner, Mr. Turner,

---

[2]The complaint states that JAT sought the loan in 2005.  (Compl. ¶ 3.)  The supporting documentation makes clear that the loan was sought in 2004.

testified that the borrower on the Bank One loan is KAI Management,[3] not JAT. (Defs.' Mot., Ex. F at 55.) Although JAT applied for the loan, Bank One "turned the loan around and put it in KAI Management because of the property. JAT applied, but KAI Management had the property for the collateral." (*Id.* at 56.) Mr. Turner conceded that the statement "JAT subsequently obtained a $950,000 loan from Bank one at a higher rate of interest," found in paragraph 4 of the complaint, is "incorrect." (*Id.*)

Plaintiff Body of Christ is a church located in Detroit with a predominantly African-American congregation. (Pls.' Resp. at 7.) In 2004, Body of Christ contacted the Bank seeking a loan. (*Id.*) One of the Bank's loan officers responded with a loan proposal letter dated September 7, 2004. (Pls.' Resp., Ex. 20.) In response, Body of Christ submitted a loan application on October 21, 2004. (*Id.*, Ex. 21.) Body of Christ then decided to submit a loan package through EVO because EVO had access to more banks and because EVO has a contracting company and Body of Christ needed repair work done on its church. (*Id.*, Ex. 19 at 43-44.) On January 11, 2005, EVO requested a loan for Body of Christ from three different financial institutions, including the Bank. (Defs.' Mot., Ex. B at 50.) Bank One responded to EVO's letter on February 4, 2005, and offered terms and conditions that were better than those requested by EVO. (*Id.*, Ex. C at 56-57.) Body of Christ accepted the Bank One loan on February 14, 2005. (Defs.' Mot. at 4; Pls.' Resp. at 7.) Body of Christ claims that Mr. Peake (a former employee of the Bank) later stated that he discriminated against Body of Christ when he failed to contact the church to inform it that it had been "totally rejected" for the loan. (Pls.' Resp., Ex. 19 at 34.)

---

[3]KAI Management is owned by John and Yvonne Turner and is a company "separate and apart from JAT." (Defs.' Mot., Ex. F at 11.)

Plaintiff Good Fight is a church located in Wayne County, outside of Detroit, with a predominantly African-American congregation and an African-American pastor. (Compl. ¶ 5.) Good Fight used EVO to search for financing to purchase a property located in Detroit. (Defs.' Mot. at 5; Pls.' Resp. at 6.) EVO prepared three identical letters addressed to three different banks: the Bank, Comerica, and First Independence National City Bank. (Defs.' Mot., Ex. D at 65.) The letters were dated January 27, 2006, and sought financing on behalf of Good Fight. (*Id.* at 65-66.) Although Good Fight claims that it doesn't know who received the letters, it does concede that the Bank and Comerica both received the letters from EVO. (*Id.* at 68.)

After a few weeks passed, Good Fight asked why it hadn't heard back from the Bank.[4] EVO inquired, and the Bank requested a formal loan application. (*Id.*) Good Faith submitted the application on February 14, 2006. (Pls.' Resp., Ex. 14.) More time passed, Good Fight again asked about the delay, and Vince Jackson (who works for EVO) told Good Fight that "someone at National City told him that they weren't interested." (Pls.' Resp., Ex. 12 at 72.)

On March 9, 2006, Good Fight learned that Comerica had approved its loan application. (*Id.* at 73.) Good fight received a loan commitment letter from Comerica on March 14 and approved the loan commitment on March 22. (*Id.* at 73, 75.) By this time, however, the property for which Good Fight sought financing was put under contract to another buyer. (*Id.* at 55.)

---

[4]According to Good Fight, it didn't ask about responses from the other banks because it didn't know if the other banks had received the loan package, but it did know that the Bank had received the package. (Pls.' Resp., Ex. 12 at 70.)

Plaintiff Pleasant Hill is a church located in Detroit with a predominantly African-American congregation.  (Pls.' Resp. at 11.)  Pleasant Hill used EVO to apply for a commercial loan from the Bank.  (Defs.' Mot., Ex. E at 11.)  Pleasant Hill applied for a $725,000 loan; $695,000 was to refinance existing debt, and $30,000 was to build a senior citizen center.  (Defs.' Mot. at 6; Pls.' Resp. at 11.)  The Bank conditionally approved the $695,000 loan, but it denied the $30,000 loan.  (*Id.*)  On the Bank's "processing worksheet," the underwriter listed as a weakness, "future use of raw land questionable."  (Pls.' Resp., Ex. 44 at 79.)  The underwriter noted with respect to the senior center that "cost of project + how it will be financed & paid for is questionable."  (*Id.*)  Indeed, Pleasant Hill admits that there were no plans or blueprints for the project, that there was "nothing on paper," and that the project basically amounted to "a vision."  (Defs.' Mot., Ex. E at 80-81.)  Pleasant Hill subsequently received a commitment letter from Bank One for a loan in the amount of $734,472.  (Pls.' Resp., Ex. 44 at 75-76.)

Plaintiff Samaritan is a church located in Detroit with a predominantly African-American congregation.  Samaritan used EVO to apply for a commercial loan from the Bank.  (Defs.' Mot., Ex. G at 31.)  On June 15, 2004, the Bank denied the loan due to "insufficient financial statements."  (*Id.*, Ex. H at 015.)  The loan officer on the case was Mr. Peake.  (*Id.* at ¶ 18.)  He asked Nathaniel Mosley, the Vice President and Underwriting Team Leader in the Bank's Small Business Banking Credit Services Unit, to review the loan application.  (*Id.*)  Mr. Mosley did so and was assisted by Bethany Rivera, the Regional Senior Credit Officer.  (*Id.* at ¶ 19.)

On June 23, 2004, Ms. Rivera e-mailed Mr. Peake with four "questions that are still outstanding on this loan request."  (*Id.* at 018.)  Her concerns related to various ratios,

Samaritan's liquidity, and the cost per square foot of the proposed expansion, $155.55, which Ms. Rivera considered "really high." (*Id.*) On July 12, Ms. Rivera again e-mailed Mr. Peake and wrote, "We still do not have good explanations for any of the points listed in my original email. The loan is declined at this point and that decision will not be changed unless we can get comfortable with their ability to repay the loan, the collateral value, the giving units, etc." (*Id.* at 016.) Ultimately, because "Mr. Peake was not able to adequately respond to these concerns[,] the loan application remained declined." (*Id.* at ¶ 20.)

Scott Wolfiss, the Bank's former Area Sales Manger, testified that the loan was denied because the Bank "felt that the customer was getting a raw deal from their contractor because their construction request was at $155 a square foot, and typically that's higher than our normal." (Pls.' Resp., Ex. 11 at 72.) Samaritan eventually obtained a loan from Bank One for a greater amount than it initially sought from the Bank. (Compl. ¶ 7.)

Plaintiff 3M is an African-American owned business. (Pls.' Resp. at 9.) On March 16, 2004, 3M applied for a commercial loan from the Bank that was to be partially secured by a State of Michigan loan guaranty program. (Defs.' Mot. at 3; Pls.' Resp. at 9.) 3M sought a $50,000 loan. (Pls.' Resp., Ex. 32.) The Bank offered a $40,000 loan that required 3M's owner to put a lien on his residence. (*Id.*, Ex. 31 at 66-67.) The Bank also insisted that 3M's purchase orders (worth $165,000) be put up as collateral. (*Id.*; Ex. 32.) 3M accepted the loan and closed the deal on March 25, 2004. (Defs.' Mot., Ex. A at 54-55.)[5]

---

[5]In their brief, Plaintiffs discuss the experience that two non-party companies had with the Bank. (Pls.' Resp. at 11-12.) Because these other companies are not parties in this suit, the facts relating to their experience are not relevant and will not be considered by the Court for purposes of this motion.

## II. Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

Plaintiffs assert three claims in this case; they allege Defendants violated the Fair

Housing Act ("FHA"), 42 U.S.C. §§ 3601-19; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f; and the Civil Rights Act of 1866 and 1870 ("CRA"), 42 U.S.C. §§ 1981 and 1982.  The FHA provides, in relevant part, "It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race."  42 U.S.C. § 3605(a). Similarly, the ECOA provides, "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race." 15 U.S.C. § 1691(a).  And the CRA states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property" and "to make and enforce contracts."  42 U.S.C. §§ 1981(a) and 1982.

The familiar *McDonnell Douglas/Burdine* burden-shifting framework applies to all three of Plaintiffs' claims.  *See, e.g., Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007) (applying framework to FHA and CRA claims); *Mays v. Buckeye Rural Elec. Coop., Inc.*, 277 F.3d 873, 876 (6th Cir. 2002) (same with respect to ECOA claim).  Under this framework, the plaintiff must first establish a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to illustrate a legitimate, nondiscriminatory reason for the decision.  If the defendant meets this burden, the plaintiff must show that the proffered reason is a pretext that masks discrimination.  *See id.*

A prima facie case of racial discrimination can be proved by direct or circumstantial evidence.  *Hood v. Midwest Savs. Bank*, 95 Fed. Appx. 768, 777 (6th Cir. 2004) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)).  Plaintiffs concede that they have not

offered direct evidence of discrimination in this case. (Pls.' Resp. at 13-14.) The prima

facie case necessary to establish a claim with circumstantial evidence is the same under

the FHA, CRA, and ECOA. *Hood*, 95 Fed. Appx. at 778 (noting that prima facie case for

FHA and ECOA is the same); *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634

(6th Cir. 2000) (noting that prima facie case for FHA and CRA is the same).

To establish a prima facie case of discrimination using circumstantial evidence, each

Plaintiff must show:

> 1) It is a member of a protected class;
>
> 2) It applied for and was qualified for a loan;
>
> 3) The loan application was rejected despite its qualifications; and
>
> 4) The lender continued to approve loans for applicants with qualifications
>    similar to those of Plaintiff.

*Hood*, 95 Fed. Appx. at 778 (citing *Mich. Prot. and Advocacy Serv., Inc. v. Babin*, 18 F.3d

337, 346 (6th Cir. 1994)).[6] The *Hood* court elaborated on the fourth element: while each

Plaintiff "does not have to show an exact match between [its] application and the applicants

outside of the protected class who received a loan, the comparator loan files must be

'significantly parallel in every material respect.'" *Id.* at 779 (citing *Sallion v. SunTrust Bank,*

*Atlanta*, 87 F. Supp. 2d 1323, 1330-31 (N.D. Ga. 2000)). The *Hood* court concluded that

---

[6]The *Hood* court discussed the alternative prima facie elements set forth in *Mays*, 277 F.3d at
876. The *Mays* court stated that a prima facie case could be established without having to show
the fourth factor discussed in *Hood*. As the *Hood* court noted, however, *Mays'* holding was
based on a case out of the Tenth Circuit, even though the elements already had been established
by the Sixth Circuit in *Mich. Prot. & Advocacy Serv.*, 18 F.3d at 346. Because the *Mays* court
did not acknowledge or attempt to distinguish that case, the *Hood* court concluded that the *Mays*
court simply overlooked the existing Sixth Circuit formulation. *Hood*, 95 Fed. Appx. at 778 n.7.

the plaintiff in that case had not established the fourth element of a prima facie case of lending discrimination because he did "not attempt to compare his own qualifications to these other applicants; he simply relie[d] on the fact that these applicants received loans, while he did not." *Id.*

The Court will address each Plaintiff's claims in turn. First, though, the Court will address the argument made by Plaintiffs at oral argument – that they are unable to meet the fourth prong of a prima facie case because they were not permitted to conduct adequate discovery. Plaintiffs filed a motion for leave to send a letter and questionnaire to loan applicants in the City of Detroit for the purpose of learning the applicants' race. (Docket Text # 96.) Plaintiffs did not disclose the contents of the proposed letter and questionnaire to the Court, however. The Court therefore denied Plaintiffs' motion. (Docket Text # 109.) The Court did not foreclose the possibility of Plaintiffs learning the applicants' race; rather, the Court invited Plaintiffs to seek relief "in a proper motion." (*Id.* at 4.) Plaintiffs never followed up. Accordingly, any lack of discovery on this issue is due to Plaintiffs' own inaction, not due to any order of this Court.

**A. Plaintiff 3M**

Plaintiff 3M has asserted claims under the FHA, the ECOA, and the CRA. Defendants argue that 3M's FHA and ECOA claims are time-barred. Plaintiffs did not address this argument in their response brief. The Court agrees that these claims are untimely.

The statute of limitations is two years for the FHA, 42 U.S.C. § 3613(a)(1)(A), and for the ECOA, 15 U.S.C. § 1691e(f). 3M's claims are premised on the fact that its owner was required to place a lien on his personal residence as a condition of loan approval. 3M

applied for the loan on March 16, 2004, and it accepted the Bank's loan offer on March 25, 2004. The Bank's allegedly wrongful conduct, requiring 3M's owner's house to be used as collateral for the loan, therefore occurred on or before March 25, 2004. Plaintiffs' complaint was filed on April 25, 2006. (Docket Text #1.) 3M was not added as a party until the amended complaint was filed on July 31, 2006. (Docket Text # 9.) As both the initial and amended complaints were filed more than two years after the conduct that gave rise to 3M's FHA and ECOA claims, those claims are time-barred. *See also Mays*, 277 F.3d at 879 (noting that ECOA's limitations period focuses on the discriminatory conduct, not the consequences of that conduct); *Tolbert v. Ohio Dept. of Transp.*, 172 F.3d 934, 939 (6th Cir. 1999) (calculating FHA limitations period from time when the defendant denied the plaintiffs' request). Because 3M's FHA and ECOA claims were not timely, Defendants' motion for summary judgment is GRANTED with respect to those claims.

With respect to its CRA claim, 3M has failed to establish a prima facie case. First, 3M has offered no evidence to establish that it was qualified for the loan it initially sought. 3M sought a loan under the Contractors Assistance Program ("CAP"). (Defs.' Mot. at 10; Pls.' Resp. at 9.) To qualify for a CAP loan, an applicant must have "a bona fide contract on a project receiving funding/financing from the [Michigan State Housing Development] Authority under any of its programs." (Docket Text # 59-4 at 7.) During its deposition, 3M was asked:

> Q.   You ever done any work for the Michigan State Housing Development Authority?
>
> A.   No, no. I was thinking -- no, not directly.
>
> Q.   When you say not directly, what do you mean?

11

A. I mean that they certify people to do lead abatement, so we have that status.

Q. They do training and certification?

A. Yes.

Q. But you haven't worked on any of their projects?

A. No.

Q. And that's true for the entire period of 1989 'til today [August 15, 2007]?

A. Right.

(Defs.' Mot., Ex. A at 10.)

Plaintiffs complain that Defendants' counsel misstated the eligibility requirements for a CAP loan by asking if 3M had any projects directly with the Housing Development Authority, which "cut[] out the middle man." (Pls.' Resp. at 21.) Even if this were true, 3M has not offered any evidence to show that it met the actual eligibility requirements for a CAP loan. Accordingly, 3M cannot establish the second element of a prima facie case.

Second, 3M has not shown that the Bank continued to approve loans for applicants who were "significantly parallel in every material respect." *Hood*, 95 Fed. Appx. at 779. Instead, 3M simply points to a $22,000 loan the Bank granted to a company in Wyandotte, Michigan (a locale Plaintiffs claim is 96.3% white) in which the company's owner was not required to collateralize his residence. This evidence is deficient in several respects. To begin, 3M sought a loan for more than twice the amount than that given to the Wyandotte company. Further, and more significantly, 3M made no attempt to compare its own qualifications with those of the other company. Instead, 3M simply relies on the fact that the other company received a loan while 3M did not. As the *Hood* court recognized, such

a showing is not sufficient to establish a prima facie case. Accordingly, Defendants' motion is GRANTED with respect to 3M's CRA claim.

## B. Plaintiff Body of Christ

Plaintiff Body of Christ's claims against Defendants arise under the ECOA and the CRA. The claims stem from the Bank's delay in processing Body of Christ's loan application.

Body of Christ has met the first three elements of a prima facie case. It has established that it is a member of a protected class. Additionally, the loan proposal from the Bank constitutes evidence from which a reasonable trier of fact could conclude that Body of Christ was qualified for the loan. With respect to the third element of a prima facie case, Body of Christ has provided the testimony of the Bank's branch manager, Cynthia Smith, who believes that the loan was declined. (Pls.' Resp., Ex. 22 at 40.) Viewed in the light most favorable to Body of Christ, this testimony creates a triable issue of fact.

Body of Christ runs into trouble with the fourth element of a prima facie case. In an attempt to satisfy this element, Body of Christ points out that Lakeshore Presbyterian Church, "located in 96.9% white St. Claire Shores, was approved" for a $700,000 loan on February 25, 2005. But Body of Christ has provided no evidence to the Court to establish that its qualifications were similar to those of Lakeshore Presbyterian. Moreover, according to the documents submitted by Plaintiffs, Lakeshore Presbyterian applied for that loan on October 25, 2004. (Pls.' Resp., Ex. 26 at 3421.) Thus, that loan took four full months to be approved. Body of Christ first submitted a loan application to the Bank on October 21, 2004, and it accepted a loan with Bank One on February 14, 2005, a period of less than four months. Accordingly, Lakeshore Presbyterian's loan application was not processed

in a more timely manner.  Since Body of Christ's claim is premised on the relative delay to its own application, this fact is fatal to Body of Christ's argument.

In support of its claim, Body of Christ seeks to admit the alleged statement of Mr. Peake that "he himself had discriminated against Body of Christ by not informing Pastor Tate that Body of Christ's application was 'totally rejected.'"  (Pls.' Resp. at 19.)  This statement is inadmissible on a number of levels.  First of all, the statement is inadmissible hearsay, and "evidence submitted in opposition to a motion for summary judgment must be admissible.  Hearsay evidence . . . must be disregarded." *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (citation omitted).  Contrary to Body of Christ's assertion, the statement is not admissible pursuant to Fed. R. Ev. 804(b).  The case cited in support by Body of Christ, *Gilmore v. Davis*, 185 Fed. Appx. 476, 484 (6th Cir. 2006), is easily distinguishable, as the statement at issue in that case was made in prior testimony.  Here, in contrast, Mr. Peake's alleged statement was made out-of-court.  This is a dispositive difference under Rule 804(b).

A party must make two showings under Rule 804 before a hearsay statement may be admitted.  First, the party must show that the declarant is "unavailable."  Fed. R. Ev. 804(a).  A declarant is considered unavailable if he "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." *Id.* at (a)(2).  Here, Mr. Peake was subpoenaed for a deposition, but he continually refused to obey the subpoena.  (*See* Docket Text # 135.)  For purposes of this motion, the Court will assume that this constitutes a refusal to testify despite a court order.

This does not end the Court's inquiry, however.  Once a declarant is found to be unavailable, his testimony is admissible only if it falls under one of the hearsay exceptions

14

set forth in Rule 804(b). As discussed above, Mr. Peake's statement was not made in the form of prior testimony; therefore, that exception does not apply, and *Gilmore* is inapposite. The only other exception under which Mr. Peake's statement might fall is a "statement against interest." *Id.* at (b)(3). Mr. Peake's alleged statement was made some time after Body of Christ's loan request was denied, and Mr. Peake joined Body of Christ as a Plaintiff in a discrimination lawsuit against the Bank. Given that the statement constitutes the bulk of the proposed evidence for Body of Christ's claims, and that Mr. Peake's own claims in this case were premised on the Bank's denial of the other Plaintiffs' loans, s*ee* Compl. ¶¶ 45, 46, Mr. Peake's statement can hardly be said to have been "against interest." Because the statement does not fall under an exception in Rule 804(b), it is inadmissible hearsay and cannot be considered by the Court for purposes of this motion.

The statement is inadmissible for a different reason, too. The Court previously held Mr. Peake in contempt for failing to obey the subpoena; as a result, the Court granted Defendants' motion to bar Mr. Peake's testimony and ordered that "Mr. Peake will have no opportunity to testify either by deposition or at trial." (Docket Text # 135.)

In light of the above, Defendants' motion for summary judgment is GRANTED as to Body of Christ's claims.

### C. Plaintiff Good Fight

Plaintiff Good Fight's claims also arise under the ECOA and the CRA. With respect to the ECOA, Good Fight alleges two violations by the Bank. First, Good Fight argues that the Bank violated 12 C.F.R. § 202.9, which is found in "Regulation B, the series of Federal Reserve Board regulations implementing the ECOA." *Mays*, 277 F.3d at 878. This regulation requires a creditor to notify an applicant when an adverse action is taken and the

reasons for that action. 12 C.F.R. § 202.9(a). The regulation provides an exception to this requirement for "applications submitted to a third party." *Id.* at (g). Under this exception, "[w]hen an application is made on behalf of an applicant to more than one creditor and the applicant expressly accepts or uses credit offered by one of the creditors, notification of action taken by any of the other creditors is not required." *Id.*

Here, EVO applied for the loan on behalf of Good Fight, and the application was made to more than one creditor. Additionally, Good Fight accepted credit from another creditor when it accepted the loan from Comerica.[7] Accordingly, the exception applies, and the Bank was not required to notify Good Fight of any action taken on its application.[8] Thus, the Bank's failure to send a notice to Good Fight was not a violation of the ECOA, and Defendants' motion for summary judgment is GRANTED as it relates to this claim.

Good Fight's second claim is that the Bank violated the ECOA and the CRA "by rejecting Good Fight's loan application despite its qualifications, while approving loans to two churches located in white areas in a far more timely and solicitous manner." (Pls.'

_____

[7]Plaintiffs argue that notice is required if the applicant "does not use any credit offered." (Pls.' Resp. at 19 n.14 (citing 12 C.F.R. § 202.9(g).) Plaintiffs' citation is incomplete. The regulation states that notice is required if "no credit is offered or if the applicant *does not expressly accept* or use the credit offered." *Id.* (emphasis added). Because Good Faith expressly accepted the credit offered by Comerica, notice was not required.

[8]Plaintiffs argue that the exception does not apply because "there is no evidence that Defendant Bank even follows this exception in its ordinary course of business." (Pls.' Resp. at 18 n.14.) Plaintiffs cite no authority to support their position, and the Court fails to see how the fact that the Bank provided adverse action notices to other parties when it was not required to somehow obligated the Bank to provide such a notice to Good Fight, even though the exception in § 202.9(g) applies.

Plaintiffs also argue that the exception does not apply because "Pastor Jackson [of Good Fight] was not put in contact with Comerica until after Defendant Bank had declined the application." This alleged fact is irrelevant, since it is undisputed that the letters prepared by EVO bore the same date and were sent to and received by the Bank and Comerica.

Resp. at 18.) This claim fails. Good Fight has offered sufficient evidence to show that it was qualified for the loan, since it was approved by Comerica. Good Fight has not demonstrated, however, that the "two churches located in white areas" had similar qualifications to those of Good Fight; indeed, Good Fight does not address the other churches' qualifications at all. Because Good Fight has failed to make these showings, it has not established a prima facie case of discrimination under the ECOA or under the CRA. Defendants' motion for summary judgment with respect to those claims is therefore GRANTED.

### D. Plaintiff JAT

Plaintiff JAT's claim arises under the CRA. The claim is based on the fact that JAT's loan application was denied, while a "Caucasian business with a lower DSC ratio received an SBA-guaranteed loan." (Pls.' Resp. at 20.) JAT's claim fails because it cannot make out a prima facie case of discrimination.

JAT has failed to present evidence that shows it was qualified for the loan. Although JAT claims that it obtained a similar loan from Bank One, JAT's owner testified that this allegation is "incorrect." (Defs.' Mot., Ex. F at 56.) It was KAI Management, a separate company owned by JAT's owners, that received the loan from Bank One, because "KAI Management had the property for the collateral." (*Id.*)

Additionally, JAT has failed to establish that the "Caucasian" business had similar qualifications to those of JAT. JAT's only attempt to compare the two companies' qualifications is its statement that the other company had "a DSC ratio of 0.92, lower than JAT's 1.21." (Pls.' Resp. at 10.) But as the document submitted by JAT to support this assertion shows, the Bank looks at a number of criteria, including the DSC ratio, the total

17

potential exposure, the business total score, the scored SIC code, and loan guarantors. (Pls.' Resp., Ex. 41.) Additionally, the Bank looks to factors such as the proportion of certain ratios and the applicant's liquidity. (Defs.' Mot., Ex. H at ¶ 20.) JAT has not addressed any of these areas. Accordingly, its comparison of DSC ratios is insufficient to show that it was "significantly parallel in every material respect" to the "Caucasian" business that was approved. *Hood*, 95 Fed. Appx. at 779.

JAT cannot make out a prima facie case of discrimination, and Defendants' motion for summary judgment is GRANTED with respect to JAT's CRA claim.

### E. Plaintiff Pleasant Hill

Plaintiff Pleasant Hill's claim is based on the CRA and stems from the Bank's denial of its $30,000 loan request (notwithstanding the Bank's approval of Pleasant Hill's $695,000 loan request) and the Bank's approval of a $50,000 loan to Covenant Alliance Church, which is located in "93.2% white Beverly Hills, MI." (Pls.' Resp. at 11, 22.) Here, Pleasant Hill has raised a genuine issue of fact with respect to its qualification for the additional $30,000, as it subsequently received a commitment letter from Bank One for a $734,472 loan.

Like the other Plaintiffs, however, Pleasant Hill has offered no evidence to establish the similarity of its own qualifications with those of Covenant Alliance. Further, while Pleasant Hill was approved for a $695,000 loan, Covenant Alliance only received a $50,000 loan. This is hardly a good comparison by which to prove the Bank's supposed discrimination against Pleasant Hill. In any event, Pleasant Hill's lack of evidence to establish that it shared similar qualifications with Covenant Alliance is fatal to its claim. Defendants' motion for summary judgment is therefore GRANTED as to Pleasant Hill.

**F. Plaintiff Samaritan**

Plaintiff Samaritan's claim arises under the CRA. The claim is based on the Bank's denial of Samaritan's loan application and approval of a loan for Columbus Bible Church, "located in 97% white Columbus Township." (Pls.' Resp. at 9.) Samaritan has raised a triable issue of fact with respect to its qualifications for the loan, for it obtained a loan from Bank One for a greater amount than it sought from the Bank. Samaritan's claim fails, however, for the same reason as the other Plaintiffs' claims; namely, it has failed to establish that it was similarly qualified with Columbus Bible Church. While Samaritan does point out that Columbus had a lower "church matrix score" than Samaritan, Samaritan has not addressed the numerous other factors the Bank considers when it determines how to proceed with a loan application. *See supra* at 16-17. As discussed above, this is an insufficient showing to establish a prima facie case, and Defendants' motion for summary judgment is GRANTED with respect to Samaritan's claim.

Ultimately, Plaintiffs do "not attempt to compare [their] own qualifications to these other applicants; [they] simply rel[y] on the fact that these applicants received loans, while [they] did not." *Hood*, 95 Fed. Appx. at 779. The Court therefore reaches the same conclusion as the *Hood* court, and holds that Plaintiffs have "not created a genuine issue of material fact as to the fourth element of [their] prima facie case." *Id.*

**G. Plaintiffs' Expert**

Plaintiffs have submitted the report of their proposed expert, Dr. Adrian Lottie, in an attempt to show that "pattern and practice evidence" contained therein "establishes that Defendants have acted with a discriminatory animus against African-American borrowers

in Detroit." (Pls.' Resp. at 14.) The thrust of the report is that as the African-American population of a given area increases, the number of small business loan approvals from the Bank to businesses in that area decreases. (*See id.*) This evidence does not save Plaintiffs' claims.

First, it does not help the individual Plaintiffs establish a prima facie case of discrimination. Plaintiffs concede that Dr. Lottie did not analyze the Bank's underwriting guidelines. (Pls.' Resp. at 15-16.) Indeed, Dr. Lottie himself stated that he is "not an expert in that area." (Defs.' Mot., Ex. K at 121.) Dr. Lottie's report therefore cannot demonstrate that Plaintiffs were qualified for the loans they sought, which is the second element in a prima facie case.

Dr. Lottie also acknowledged that he did not know the race of the applicants whose files he reviewed. (*Id.* at 119.) In fact, Plaintiffs point out that financial institutions are prohibited by law from inquiring about the race of nonmortgage loan applicants. (Pls.' Resp. at 16 n.10 (citing 12 C.F.R. § 202.5(d)(5).)[9] As a result, Dr. Lottie could not analyze the likelihood of equally qualified minority and non-minority applicants being approved for a loan by the Bank. (Defs.' Mot., Ex. K at 119.) Thus, Dr. Lottie's report also cannot help Plaintiffs establish the fourth element of a prima facie case, that non-minority applicants who were "significantly parallel in every material respect" were approved for loans, while minority applicants were not.

Plaintiffs suggest that Dr. Lottie's report shows redlining based on the racial composition of neighborhoods, and that such evidence is sufficient to maintain Plaintiffs'

_____

[9]Plaintiffs have not rebutted Defendants' evidence that its underwriters do not know the race of loan applicants. *(See, e.g.,* Defs' Mot., Ex. H at ¶ 22.)

claims. (Pls.' Resp. at 16.) The Court disagrees. First, the only support offered by Plaintiffs is a district court case from 1987 which does not stand for the proposition put forth by Plaintiffs. In *Old West End Ass'n v. Buckeye Fed. Sav. & Loan,* 675 F. Supp. 1100, 1102 (N.D. Ohio 1987), the court was simply setting forth the plaintiff's allegation when it stated, "Plaintiffs allege that defendants have discriminated in the financing of housing based upon the racial composition of the neighborhood in which the property is located."

Second, and more importantly, "the pattern-or-practice method of proving discrimination, in which the plaintiff shows that the company had a policy of discriminating against a protected class, is not available to individual plaintiffs." *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004). Such evidence is limited to "class actions or suits by the government," *id.*, and the Court denied Plaintiffs' motion for class certification. (Docket Text # 74.) As the *Bacon* court explained, "there is a 'manifest' and 'crucial' difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination." *Id.* (citation omitted). The court concluded that because pattern-or-practice evidence "does not address individual . . . decisions, it is inappropriate as a vehicle for proving discrimination in an individual case." *Id.* While such evidence "may be relevant to proving an otherwise-viable individual claim," *id.*, Plaintiffs' discrimination claims are not "otherwise-viable."

Equally unavailing is Plaintiffs' attempt to equate this case with *Paschal v. Flagstar Bank*, 295 F.3d 565 (6th Cir. 2002). In that case, an expert witness compared the minority plaintiffs' mortgage applications with those of Caucasian applicants who had similar

financial qualifications.[10]  *Id.* at 582.   Such a comparison was directly relevant and specific to the plaintiffs' individual discrimination claims.  Here, in contrast, Dr. Lottie admittedly did not conduct a similar analysis, and any conclusions reached by Dr. Lottie are therefore not specific to Plaintiffs' individual claims.  Accordingly, under *Bacon*, those conclusions cannot be used to establish Plaintiffs' individual claims.

## IV.   Conclusion

Plaintiffs cannot establish a prima facie case for any of their discrimination claims. Accordingly, it is not necessary for the Court to engage in the remainder of the *McDonnell Douglas/Burdine* analysis.  Defendants' motion for summary judgment is GRANTED in its entirety.

---

[10]For mortgage loan applications, financial institutions are required to collect data on applicants' race.  12 C.F.R. 203.4(a, b).